APPEAL OF UNA LIBBY KAUFMAN, EXECUTRIX OF THE ESTATE OF
SAMUEL R. KAUFMAN.

Docket No. 4698. Decided October 8, 1926.

1. Upon the evidence submitted, *held*, that a transfer of certain stock by the decedent to his wife was not made in contemplation of death but was a transfer intended to take effect in possession or enjoyment at death.

2. *Held, further*, that a gift of certain Liberty bonds, which were afterwards exchanged by the donee for stock, was not a transfer in contemplation of or intended to take effect at or after death.

3. A deduction of $15,000 as executor's commissions allowed.

*Robert L. Floyd, Esq.*, for the petitioner.
*Frank T. Horner, Esq.*, for the Commissioner.

This is a proceeding for the redetermination of a deficiency of $26,260.44 in estate tax under the provisions of the Revenue Act of 1921. The questions presented are: (1) Whether any portion of the value of certain real estate, located in Powell Township, Mich., owned by decedent and his wife, should be included in the gross estate; (2) whether the transfer of certain stock and bonds by the decedent to his wife and children was made in contemplation of death or was intended to take effect in possession or enjoyment at or after death; and (3) the propriety of a deduction of $15,000 as executor's fees.

FINDINGS OF FACT.

Samuel R. Kaufman, a resident of Chicago, Ill., died April 29, 1922, at the age of 58 years. By the terms of his will his property passed to his wife and three children, the former and her elder son, Robert Libby Kaufman, being named in the will as executors. Mrs. Kaufman qualified as executrix, but Robert, not having attained his majority, under the statutes of Illinois was unable to qualify. He appears to have been acting, either as executor or trustee, however, when the estate-tax return was filed on April 9, 1923.

In computing the value of the gross estate the executrix excluded therefrom the amount of $5,600, representing the total value of certain real estate held by decedent and his wife as tenants in the entirety, 4,434 shares of the common stock of the Congress Hotel Co. of the value of $443,400, and 400 shares of Chatham & Phenix National Bank stock of the value of $94,800, and she deducted $15,000 as executor's commissions. The Commissioner increased the value of the gross estate by including therein the above-mentioned amounts and by disallowing the deduction of $15,000 as executor's commissions. He thereby increased the tax from $1,718.07, as shown by the return, to $27,978.51, resulting in a deficiency of $26,260.44.

At the time of his death the decedent and his wife owned certain real estate located in Powell Township, Mich., of a total value of $5,600.

In October, 1915, Samuel R. Kaufman and his brother, Nathan M. Kaufman, entered into an agreement with one another that, in the case of the death of either, the shares of the stock of the Congress Hotel Co. owned by the party so dying should be purchased by the survivor upon the following terms, to wit:

1st. The price to be paid for such stock shall be the par value thereof, without regard being had to the then market value of said stock, whether the same shall be above or below the par value thereof.

\*     \*     \*     \*     \*     \*     \*

3rd. Payment for such stock shall be made by the surviving parties hereto by giving their promissory note payable to the order of the Executor or Administrator of such deceased party on or before ten years from and after the date of the death of such deceased party, and shall bear interest at the rate of five per cent (5%) per annum, payable semi-annually.

Nathan M. Kaufman died in November, 1918, being the owner at that time of 5,900 shares of Congress Hotel Co. stock. The decedent was the executor under his will and, pursuant to the agreement entered into between them, purchased 4,371 of the 5,900 shares, giving his promissory note therefor and waiving his right to purchase the remainder. The note was payable to the residuary legatees. In March, 1919, a 50 per cent stock dividend was declared upon the stock, increasing thereby the number of shares then owned by Samuel R. Kaufman to 6,556. These shares were owned by him at the time of his death and his note therefor was outstanding.

Upon the death of Samuel R. Kaufman the shares of stock purchased by him from the estate of Nathan M. Kaufman, including those issued thereon as a stock dividend in March, 1919, were transferred to the payees of the decedent's promissory note, given by him in payment for the 4,371 shares, whereupon the note was canceled and surrendered to the executrix of the will.

On or shortly prior to April 20, 1920, the decedent made an absolute gift to his wife, for herself and the children, of $84,500 in United States bonds and told her to " put them away and take care of them." At the time she had in her safe deposit box $2,000 of Liberty bonds purchased with funds belonging to their three children. Upon the receipt of the bonds from her husband, she rented a larger safe deposit box to which she alone had access. The bonds were given to her absolutely, without reservation of income or any agreement relative thereto. She clipped the coupons from time to time, but instead of cashing them herself sent them to her husband in Chicago, or handed them to him when he was at home, to be cashed by him.

This was her usual custom relative to all securities purchased and owned by her and the children with their separate funds, prior to her husband's death. It was not because of any request on his part, or of any agreement between them, but because he handled all matters on her behalf relating to the acquisition or change of securities, or other financial matters. He gave his wife various sums of money from time to time for the payment of household expenses and rent, in excess of $28,000 annually, and he also gave her sums in varying amounts for her personal use. Neither at the time the bonds were given to her, nor at any time thereafter, was anything said by the decedent relative to the income therefrom. As Mrs. Kaufman testified:

> He never said a word. It was never discussed, any more than when I gave him the coupons, and as I say, at the time when I gave him those coupons I was conscious of the fact that we were under heavy expenses and he expected we would be, and I just gave him the coupons because I thought we needed them. There was never any discussion as to whether he would cash the coupons and give them back to me or not. I did not expect he was going to do that, but there was never any request on the part of Mr. Kaufman about those coupons at all and never any suggestion on his part that the time was due to cut them or what I would do with them or anything of that sort. It was the only thing for us to do at the moment. I had no other use for the money, other than for the family. Certainly, it would have been very strange for me to accumulate an income when I needed it really for the children, if Mr. Kaufman did not have enough at the moment to take care of the expenses.

On or before December 15, 1921, the decedent told his wife of an opportunity to invest in some stock of the Chatham & Phenix National Bank, suggesting that it would be a good idea to exchange the Government bonds therefor, and asking her at the same time what she thought about it. She replied that it seemed to her that Government bonds were better for women and children. He stated that he was sorry she regarded it in that light, as he considered it a good investment. Their conversation resulted in her requesting him to negotiate the investment. She removed the $86,500 of bonds from the deposit box, gave them to him and drove with him to the bank to make the exchange. He gave her the receipt of the Chatham & Phenix National Bank for the bonds dated December 15, 1921. This receipt showed the issuance or exchange of the bonds for 400 shares of bank stock, 100 shares to Mrs. Kaufman and 100 shares to each of the three children. Mrs. Kaufman placed the receipt, together with the Chatham & Phenix stock, which she received a few days later, in her safe deposit box, the rent for which she paid and to which she alone had a key. These 400 shares cost $89,500, the difference between the value of the bonds and the cost being paid

by the decedent from his funds. At the time of the exchange he purchased for himself 200 shares of the Chatham & Phenix stock.

In 1916 the decedent became ill and his physician, believing that he was suffering from appendicitis, performed an operation, removing the appendix. He soon recovered, however, and enjoyed good health, aside from an occasional cold. Some time during 1919 he became slightly indisposed as a result of a cold and consulted a physician who had been his personal friend for many years. This physician made a thorough examination, as was his custom, no matter how slight the ailment might be. The examination disclosed that the decedent had a slight enlargement of the liver, as a result of which he was advised to wear an abdominal support, which he did for a short time. The decedent suffered no further illness or impairment of his general health until the spring of 1921, when he contracted influenza. In a short time he had apparently recovered from this attack and left Chicago to visit his home in New York. Soon after his arrival there he suffered a relapse and developed an intestinal condition which involved the gall ducts and produced jaundice. In addition, erysipelas developed on the ear and neck and, as the physician testified:

The toxemia or poisoning was so intense that it not only produced a condition which deprived him—that is, a delirious condition for several weeks, but it involved almost every organ in the body, so that twice, on account of the intensity of the poisoning, I was compelled to wash out the blood, so to speak, with a solution of salts, and at one time death was imminent and I had to take extraordinary measures of stimulation to bring him around again.

This illness covered the month of April and the early part of May, 1921. Thereafter his condition improved steadily. He visited his summer camp in Michigan, as was his custom each summer, and upon his return in October, 1921, his health and general condition were better than they had been prior to his illness. He continued in the active management of his affairs, particularly in the management of the Congress Hotel at Chicago, discussing with his counsel and friends certain other business ventures in which he was interested.

On December 3, 1918, the decedent and his brothers, Daniel W. Kaufman, Harry L. Kaufman and Louis G. Kaufman, entered into a contract similar to the one hereinbefore referred to between Samuel R. Kaufman and his brother, Nathan M. Kaufman, dated in October, 1915.

On August 30, 1921, his brother, Daniel W. Kaufman, died leaving a will in which he designated Samuel R. Kaufman as his executor, and soon thereafter, in accordance with the terms of the agreement between them, the survivors to the contract took over the shares

of Congress Hotel Co. stock owned by him. At this time Samuel R. Kaufman expressed to his attorney his objection to insisting upon the terms of the contract but stated that his brothers desired to carry out the same according to its terms and that he was being coerced, against his judgment, into carrying out his portion thereof. He felt that the agreement was unfair in so far as he was concerned. He was much disturbed over the fact that, being the owner of so much more stock than the other parties to the contract, he would be depriving his family, in case of his death, of one-third of the par value of the stock owned by him, since, if the other parties to the agreement acquired his stock, it would bring only $66.66 a share by reason of the fact that any stock which had been issued as a stock dividend was, under the terms of the contract, to be included as a part of the original shares without cost.

He consulted his attorney as to the validity of the agreement and was advised by him that it was binding only in respect of such portion of Congress Hotel Co. stock of which he might be the owner at the time of his death, there being no provision in the contract which would compel him to retain any of the shares of stock or restrict him in the sale or disposition thereof; that whatever portion he might dispose of by gift or sale would not be subject to the terms of the contract upon his death. His attorney thereupon urged him to make a gift of the stock and, as he had for some time contemplated giving a portion of it to his wife, he made plans forthwith as to his indebtedness in order that the stock, which had been placed with certain banks as security, might be released so that the transfer and delivery thereof might be made. By December, 1921, the decedent had obtained the release of 4,434 shares of the stock and had the same transferred upon the books of the company to his wife. Shortly thereafter he informed his attorney of the transfer and stated to him that it was his purpose to endeavor to have his brothers agree to the cancellation of the contract between them relative to the acquisition by the survivors of the stock of the one who should die first.

He left Chicago about December 3, 1921, for his home in New York, and upon his arrival delivered to his wife the 4,434 shares of the Congress Hotel Co. stock with the statement, " There is that stock I have been promising you for so long." Nothing further was said relative thereto. Some time later the decedent asked his wife what she had done with the stock and, upon being informed by her that she had placed it in a little closet where she kept her jewelry, he stated that the stock was valuable and asked her if she did not think it should be placed in her safe deposit box. Thereupon she placed it in her safe deposit box on that date.

On January 1, 1922, a 4 per cent dividend was declared by the Congress Hotel Co., resulting in a dividend of $17,736 upon the 4,434

shares theretofore transferred to Mrs. Kaufman. The decedent directed the secretary of the Congress Hotel Co. to make the check for the stock standing in the name of Mrs. Kaufman payable to him. This was done and the dividend check was deposited in the bank to his credit. On April 1, 1922, a further dividend of 2 per cent was declared and the dividend check of $8,868, due upon the 4,434 shares of stock in the name of Mrs. Kaufman, was made payable and delivered to the decedent and deposited to his credit.

About January 10, 1922, the decedent advised his attorney that his brothers had agreed to a modification of the contract relative to the acquisition by the survivors of the stock of the one who should die first, to provide as follows: That the first 5,000 shares should be purchased at par and that any excess above the 5,000 shares of the stock issued at the time of the contract should be purchased at $150 a share, and that only such stock as might be declared as a stock dividend after January 10, 1922, should be included without cost. This modified agreement was executed on January 10, 1922.

The decedent was thereafter active in the management of his various interests and enjoyed good health until the night of April 29, 1922, when he was stricken and died a few hours later from a gastric hemorrhage.

In a will executed five months prior to his death the decedent named his son, who was under 21 years of age, as one of his executors. The son was not old enough at the time of the decedent's death to qualify as an executor.

#### OPINION.

LITTLETON: The first question is whether the Commissioner erred in including in the gross estate certain real estate in Powell Township, Mich., of the value of $5,600.

The second issue relates to the question whether the transfer of the 4,434 shares of common stock of the Congress Hotel Co., made by the decedent to his wife on December 3, 1921, about five months prior to his death, was made in contemplation of death or was intended to take effect in possession or enjoyment at or after death.

The third issue is whether 3,045 shares of the Congress Hotel Co. stock, being the number of shares remaining in the estate exclusive of the 4,434 shares transferred to Mrs. Kaufman and the 6,556 shares given by the estate in payment of the decedent's note for $437,100 and not purchased by his brothers under the agreement, constituted a part of the gross estate, and whether, if they did, they should be included therein at $101.50 a share, which is conceded to be the fair market value at the time of death, or at the value for which the surviving brothers might have purchased them, had they so elected, under the terms of the contract.

The fourth issue relates to the question whether the 400 shares of the capital stock of the Chatham & Phenix National Bank owned by the decedent's wife and three children, received by them in exchange for $84,500 of Liberty bonds given to them by the decedent on April 30, 1920, $2,000 of Liberty bonds owned by the decedent's three children and purchased for them by their mother with their own funds, and $3,000 contributed by the decedent at the time of the exchange on December 15, 1921, should be included in the gross estate as a transfer made in contemplation of death or intended to take effect in possession or enjoyment at or after death.

The fifth or last issue relates to the propriety of a deduction of $15,000 for executor's commissions.

As to the first issue, it appears that at the time of his death the decedent and his wife owned certain real estate in Michigan valued at $5,600. The executors excluded this property and the Commissioner included the same in the gross estate of the decedent at its full value.

We have no evidence as to when or under what circumstances the decedent and his wife acquired this property. It was merely alleged in the petition that they acquired it as tenants in the entirety, and this was admitted by the Commissioner in his answer. Upon this the executrix claimed that no portion of the value of the property should have been included in determining the value of the gross estate of the decedent. The only reason given for this claim was that the statutes of Michigan recognize tenancy by the entirety. The Revenue Act of 1921, section 402 (d), provides that the value of the gross estate of a decedent shall be determined by including the value at the time of his death to the extent of any interest therein held jointly or as tenants in the entirety by the decedent or any other person.

With no more evidence than is contained in the record concerning this point, we affirm the Commissioner's determination.

As to the second issue, the Board is of the opinion that, under the facts hereinbefore set forth in detail, this stock was not transferred in contemplation of death within the meaning of the Revenue Act of 1921. It appears that the decedent, prior to any illness of which the Board has knowledge, had told his wife that he intended to make her a gift of some Congress Hotel Co. stock and that this was not done for the reason that the stock was being used by him as security for loans from various banks. At the time the stock was transferred in December, 1921, the decedent had fully recovered from his illnesses. As a result, however, of a situation arising from the terms of certain agreements between himself and his brothers, he concluded, since he was the owner of practically all of the capital stock of the Congress Hotel Co., to make a gift of some of it to his

wife, not because he contemplated death within a reasonably near future, but because he desired to protect his family in the event of his death from loss by reason of the small amount which his brothers would pay for the stock should they decide to purchase it under the terms of the contract between them.  On the question of whether the transfer of this stock was one intended to take effect in possession or enjoyment at or after death, the Board is of the opinion that the Commissioner correctly included the value thereof in the gross estate upon the ground that it was a transfer intended to take effect at death.  We reach this conclusion from all the facts and circumstances surrounding the gift and relating to the decedent's conduct thereafter.

It is true that the stock was delivered to decedent's wife and transferred to her upon the books of the company.  It appears however, that he reserved to himself the income therefrom.  A 4 per cent dividend was declared on the stock on January 1, 1922— less than one month after the gift—and he directed that the same be paid to him.  This was also true in respect of the dividend of 2 per cent declared in April, 1922.  Transactions between husband and wife do not partake of the same formalities as those between strangers, and the intention of the donor in such a case is best determined from his acts and conduct in relation to the subject matter. It was not necessary for the decedent to have a formal understanding with his wife that the dividends upon the stock should be paid to him during his life or for any period of time.  He had no reason to believe that she would insist upon the dividends being paid to her. There is nothing in the record to indicate that the decedent, prior to his death, changed his intention in regard to the payment of dividends to him and, under these circumstances, the transfer took effect at his death.

In the case of *In re Brandreth's Estate*, 169 N. Y. 437; 62 N. E. 563, the decedent had made a transfer of certain stock, reserving to himself the dividends thereon and the right to vote the stock.  The court said:

The effect of these instruments was to transfer to the daughters the remainder in the stock after the donor's death, reserving to the latter an estate for his life.  It is said by the learned appellate division that there is a difference between the stock itself and the dividends that may be declared upon it. This is doubtless true, but it is the same difference that exists between land and its rents and profits or between a fund and its income.  A devise of the rents and profits of land or a bequest of the income of a fund grants an estate in the land or the fund itself in fee or for life, depending on whether the gift of the income or rent is for life or without limitation.  *Jennings* v. *Conboy*, 73 N. Y. 230.  The only income stocks can produce is the dividend declared thereon, and the reservation of the dividends for life is the reservation of an estate for life.  A stockholder has no title to the earnings of a corpora-

tion before a dividend is declared. Until that time the earnings pass with the stock as an incident thereof, and when a dividend is declared it is a profit on the stock. * * *

* * * Though a remainder may vest in title at its creation, it cannot vest in possession until the determination of the prior estate. It makes no difference in this respect whether the remainder is vested indefeasibly or is contingent or subject to be devested. In the present case the prior estate is one for the life of the donor, and therefore the remainder transferred to his daughters falls within the exact provision of the statute as a transfer to take effect in possession or enjoyment on the death of the donor.

See, also, *In re Keeney's Estate*, 194 N. Y. 281; 87 N. E. 428.

As to the third issue, it is the opinion of the Board that the 3,045 shares which the surviving brothers, under the terms of the contract of January 10, 1922, had a right to purchase at par, but which they did not purchase, constituted a part of the estate and were properly valued by the Commissioner at $101.50 a share for the purpose of the tax. The executrix contends that this stock was subject to an agreement between the decedent and his brothers whereby they had a right to purchase the stock, and that whatever was over and above the price at which they could purchase the same should be considered as a gift from them. The surviving brothers were not compelled to purchase the stock and the most that they can be said to have had was an option to do so. They did not exercise this option and the stock remained a part of the estate.

As to the fourth issue, the Board is of the opinion under the evidence that no portion of the value of the 400 shares of the Chatham & Phenix National Bank stock constituted a part of the gross estate. As set forth in the findings of fact, the decedent in April, 1920, gave to his wife, for herself and children, $84,500 in Liberty bonds, which she kept in her possession and over which he did not have or exercise any control. In addition, it appears that Mrs. Kaufman from time to time, with separate funds of her three children, had purchased Liberty bonds in the amount of $2,000. On December 15, 1921, it appears that she concluded to exchange the Liberty bonds for stock of the Chatham & Phenix National Bank and that she delivered the bonds in the amount of $86,500 to her husband and went with him to make the exchange. At that time 400 shares of Chatham & Phenix National Bank stock were issued in the name of his wife and their three children in exchange for the $86,500 of Liberty bonds and $3,000 contributed out of his own funds. At the same time the decedent acquired in his own name 200 shares. This stock was delivered by the bank to Mrs. Kaufman and retained by her without any control thereof by her husband.

The evidence does not warrant the conclusion that the gift of the Liberty bonds on April 30, 1920, or that the $3,000 contributed by the decedent toward the purchase of the Chatham & Phenix

National Bank stock, was a gift in contemplation of death or intended to take effect at or after death.

The only circumstance which might indicate that the gift of $84,500 of Liberty bonds on April 30 was intended to take effect at or after death was the delivery by Mrs. Kaufman to her husband from time to time of the coupons clipped by her from the bonds. In the opinion of the Board, however, this circumstance does not warrant the conclusion that the gift was one intended to take effect at or after death. The decedent made no reservation of the income from the bonds at the time of the gift. The coupons which were attached to the bonds constituted a part of the gift and thereafter constituted her property. Neither at the time of the gift nor at any time thereafter did the decedent ever make any statement to Mrs. Kaufman relative to the income from the bonds. Her reason for delivering the coupons to her husband was because their expenses were heavy and she wished to contribute to the payment thereof. This was entirely a voluntary act on her part and had no relation to the character of the original gift.

The fifth and last issue relates to the propriety of a deduction of $15,000 for executor's commissions. Section 403 (a) (1) of the Revenue Act of 1921 provides for the deduction of—

Such amounts for * * * administration expenses, claims against the estate, * * * as are allowed by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered * * *.

The following provision is from Callaghan's Illinois Statutes Annotated, vol. 1, ch. 3, Administration of Estates:

Par. 135 [Compensation of representative.] § 133. Executors and administrators shall be allowed as compensation for their services a sum not exceeding six per centum on the amount of personal estate, and not exceeding three per centum on the money arising from the sale of real estate, with such additional allowances, for costs and charges in collecting and defending the claims of the estate and disposing of the same, as shall be reasonable.

The total estate left by decedent was in excess of $900,000, $437,100 of which was given in exchange for the decedent's personal note for that amount held as collateral by his brothers. All except $6,500 of this was personal property. The debts of the decedent were $241,-117.21, a large part of which was in small amounts. There is nothing to indicate that the executor's duties required less ability or were less onerous than are usual in the settlement of estates of like amounts. The commission claimed is about one and two-thirds per centum. It is not unreasonable and should be allowed. *Appeal of Samuel E. A. Stern*, 2 B. T. A. 102.

> *Order of redetermination will be entered on*
> *15 days' notice, under Rule 50.*